[Civ. No. 2774.   Third Appellate District.—March ·6, 1924.]

## L. A. DANLEY, Appellant, v. MERCED IRRIGATION DISTRICT et al., Respondents.

[1] IRRIGATION DISTRICTS—"WATER AND WATER RIGHTS" DEFINED.— The words "water and water rights" used in section 15 of the California Irrigation District Act relate to the waters to be acquired by the district and distributed by it to the different land owners, and "water rights," as they relate to the land owners, means, relates to, and indicates the right of the land owner to have and use upon his lands, as occasion requires, the quantity of water called for in his contract or which may be beneficially used in the irrigation of his lands; and so far as water rights are concerned, it embraces the right of the district to take certain waters and convey them through its systems of canals and irrigating ditches to the various points of use.

[2] ID. — "OTHER PROPERTY" DEFINED. — The words "other property" appearing in section 15 of the California Irrigation District Act mean other like property necessary for the construction, use, etc., of the works belonging to the district.

[3] ID.—"NECESSARY" DEFINED.—The word "necessary," as used in section 15 of the California Irrigation District Act, has a broader meaning than that "which is absolutely indispensable," and includes that which is reasonable, convenient, and appropriate for carrying out the purposes expressed in the section following the use of that word.

[4] ID.—"USE" DEFINED.—The word "use," as it appears in section 15 of the California Irrigation District Act following the granting of power to acquire, has a special signification; in other words, the waters and water rights and other property authorized to be acquired must be such as is used or may be used in the supply of water to be carried through the canals and irrigating ditches owned by the district.

[5] ID.—ANNUAL PAYMENTS TO OWNERS OF WATER RIGHTS—ULTRA VIRES CONTRACT.—The California Irrigation District Act does not authorize the directors of an irrigation district to enter into a contract with the owners and holders of water rights (created prior to the organization of the district) to pay them a stipulated sum of money annually for the life of such water rights, where, under the express provisions of such contract, the water rights in question are not transferred to the district, but continue exactly as they were, and such contract, stripped of its verbiage, amounts to nothing more than an agreement that, if the owners of such water rights will pay all the assessments levied upon their lands

66 Cal. App.—7

during the life of the agreement, the district will refund to them said stipulated sum annually.

[6] ID.—AUTHORITY TO PURCHASE WATER RIGHTS—NECESSITY—JURIS-DICTION OF BOARD OF DIRECTORS—REVIEW BY COURTS.—Section 15 of the California Irrigation District Act authorizes the acquisition of water rights possessed by land owners within the district, and which were created by contract with a water company prior to the organization of the district, if the acquisition of the same be found necessary for the use of the district in supplying its canals and irrigating ditches with water to be distributed to the various land owners within the exterior boundaries of the district; and the necessity for doing so lies within the jurisdiction of the board of directors and is not a matter to be determined by the courts, unless impeached or attacked for fraud or in some manner other than that which simply alleges the lack of wisdom or understanding or incapacity of the board of directors.

[7] ID. — AGREEMENT TO PAY LEGAL ASSESSMENT — CONSIDERATION.—The laws of this state do not authorize the directors of an irrigation district to agree to pay certain land owners within the district a specified sum annually in consideration of the agreement of said land owners not to contest any assessment levied by the district "in accordance with law."

[8] ID.—PROMISES TO LAND OWNERS—POWER OF BOARD OF DIRECTORS—ESTOPPEL.—Statements or promises made to the owners of water rights within a proposed irrigation district, in relation to the acquisition of their water rights by the district, in order to induce them to enter into and become a part of the larger district embracing their lands, at the time the proposal and the proceedings to create the larger district were under consideration and being had and taken, do not give the board of directors of the district any additional power than that contained in the statutes; and such promises furnish no grounds for an estoppel.

[9] ID.—AUTHORITY TO FIX RATES—VOID CONTRACT.—Section 55 of the California Irrigation District Act, which authorizes the board of directors of irrigation districts, instead of levying assessments, to fix rates of toll charges for irrigation or other public uses declared by the act and collect the sum from all persons using the canal for irrigation or other purposes, is a legislative grant and a continuing power; and a provision in a contract between an irrigation district and land owners within the district purporting to waive the right to exact tolls is without the powers of the board of directors and, therefore, void.

[10] ID. — UNAUTHORIZED ACTS — EQUITY — INJUNCTION. — Where the board of directors of an irrigation district proposes to enter into a contract not authorized by the statutes, and to make certain pay-

ments thereunder not in accordance with law, a court of equity will interfere and restrain by injunction the commission of such acts.

(1) 40 **Cyc.**, p. 821.  (2) 40 **Cyc.**, p. 821.  (3) 40 **Cyc.**, p. 821. (4) 40 **Cyc.**, p. 821.  (5) 40 **Cyc.**, p. 821.  (6) 40 **Cyc.**, p. 821. (7) 40 **Cyc.**, p. 825 (1926 Anno.).  (8) 40 **Cyc.**, p. 821.  (9) 40 **Cyc.**, p. 825 (1926 Anno.).  (10) 40 **Cyc.**, p. 821 (1926 Anno.).

APPEAL from a judgment of the Superior Court of Merced County. J. J. Trabucco, Judge Presiding. Reversed.

The facts are stated in the opinion of the court.

James F. Peck and Robert L. McWilliams for Appellant.

A. L. Cowell, F. W. Henderson and Edward F. Treadwell for Respondents.

PLUMMER, J.—The plaintiff, the appellant herein, as an owner of land situated in the county of Merced and within the exterior boundaries of the Merced Irrigation District, began this action for the purpose of restraining the irrigation district and its directors from entering into a certain contract obligating the district to pay to certain persons, hereafter designated as contract holders, annually for seventeen years the sum of $70,000 and upward.

The trial court sustained the defendants' demurrer to the plaintiff's complaint without leave to amend and thereafter entered judgment in favor of the defendants.

Prior to the formation of the Merced Irrigation District, the Merced Canal and Irrigation Company and its successor, the Crocker-Huffman Land and Water Company, entered into contracts with divers persons by the terms and conditions of which contracts said canal company and its successor, the Crocker-Huffman Land and Water Company, agreed to supply water from their canal system to such persons for the purposes of irrigation.

These contracts differ somewhat in formation but are separable into different classes, one of the contracts of each class being attached to the plaintiff's complaint as exhibits, to wit, Exhibits "A" to "P," inclusive. These contracts bound the Merced Canal and Irrigation Company and its

successor, the Crocker-Huffman Land and Water Company, to furnish water for irrigating the number of acres of land set out in each particular contract for a period of years— the period being fixed in each contract.

Some of these contracts, such as followed the form of Exhibit "A," provided for the payment of a certain cash sum, which was therein specified, for a water right not exceeding two and one-half cubic feet per second for irrigating the land therein described from the date of the contract up to and including the third day of March, 1933. Other contracts, as evidenced by the remainder of exhibits attached to plaintiff's complaint and executed by the Crocker-Huffman Land and Water Company, provided for the payment of a certain sum in cash upon the execution of the contract and further annual payments in a specified sum during the life of the contract, to wit, from the date of the execution thereof in 1892 until April 30, 1938.

It would appear, from an examination of the transcript, that practically all of the contracts entered into by the Crocker-Huffman Land and Water Company expire at about the same time, to wit, in April, 1938.

The total area of land covered by the contracts just referred to is slightly in excess of 52,379 acres.

In 1920, after due and regular proceedings, the defendant, the Merced Irrigation District, was regularly formed. This district comprises an area of 185,000 acres, including the 52,379 acres covered by the contracts hereinbefore referred to. After the organization of the said Merced Irrigation District and prior to the commencement of this action, the district purchased of the Crocker-Huffman Land and Water Company all its water and water rights and its system of canals and irrigation ditches for the sum of $2,500,000. After a suit had been begun by some of the contract holders against the defendant Merced Irrigation District to determine and establish the rights of the contract holders herein referred to, it appears negotiations for a settlement were entered into which finally culminated in a contract drawn in the form as attached to plaintiff's complaint and marked Exhibit "Q."

The said contract involved in this action is proposed to be executed by the Merced Irrigation District as a party of the first part and the contract holders herein referred to as parties of the second part. This agreement recites the execu-

tion of the contracts by the Crocker-Huffman Land and Water Company, while the owners of certain water and water rights system of canals, etc., with the contract holders as hereinbefore referred to; that the district has acquired by purchase the water and water rights of the Crocker-Huffman Land and Water Company, its system of canals and irrigation ditches; and that the rights of the contract holders to receive water at the price designated in the contracts heretofore referred to should be extinguished and acquired by the district, therefore, it is agreed on the part of the district to pay annually to the contract holders or their assigns, the sum of $70,000 per year for the period of seventeen years from and after the first day of July, 1924, provided the costs and expenses of operating the district should not exceed the sum of $146,666; that in the event the costs and expenses of operating the district should exceed that sum, eighty-five per cent of such excess should be paid to said contract holders. In fixing the costs and expenses of $146,666 per annum, certain specified costs and expenses and items to be considered are set forth in the agreement. On the part of the contract holders it is then covenanted and agreed that in consideration of the provisions of said agreement relative to payment of said sum or sums certain rights and privileges were released as follows, to wit: "In consideration of the foregoing covenants and other provisions of this agreement the said Contract Holders and each thereof hereby severally waive and release to the District all and any rights which they may have under the said Contracts to receive water from the District or from the Crocker-Huffman Land and Water Company, or from any other person, for the amounts or at the rates specified in said Contracts, and agree to pay the assessments heretofore levied by said District, and hereby agree on their own behalf and on behalf of their successors in ownership of the land to which said Contract is attached not to contest any assessment hereafter levied by said District in accordance with law by reason of dues, rights, privileges or immunity growing out of their rights under said Contracts." The agreement then provides that the contract holders will pay several assessments levied by the district against them in the year 1922 and the district agrees to accept payment thereof without exacting penalty. Paragraph 8 of the agreement purports to waive the right of the district to exact water tolls and

also for the repayment of certain amounts theretofore paid
by the contract holders under their contract during the year
1922. Said paragraph 8 is as follows: "After the execu-
tion of this agreement the said District agrees to raise funds
for the maintenance and operation of the said District, and
for the retirement of its bonds and for other purposes, by
assessments levied in accordance with law, and waives all
right to exact the sums specified in said Contracts, and
agrees not to establish or exact water tolls or rentals for
the use of water, and the amounts paid by the said Contract
Holders under the said Contracts in the year 1922 shall be
refunded by the said District or credited by the said District
on the assessment of 1922 against the said Contract Hold-
ers." Paragraph 9 of the agreement specifically limits the
extent of the waiver or conveyance or surrender of rights
on the part of the contract holders to the amount of money
agreed to be paid by them annually for the use of the water
and the exercise of their water rights; that nothing further
is intended to be relinquished or affected by the agreement
so far as their rights may be concerned. Paragraph 9 is as
follows: "Nothing herein contained shall be deemed to waive
any right which the said Contract Holders may have, either
under the said Contracts or otherwise, to a preferred right
to receive water from the said canals of the Crocker-Huffman
Land and Water Company, it only being intended hereby to
waive and relinquish their right to receive it at the par-
ticular rate specified in said Contracts, nor shall anything
herein contained be deemed as an admission by the said
District that the said Contract Holders have any such pre-
ferred right, either under said Contracts or otherwise. Nor
shall anything herein be construed as in any way relinquish-
ing any easements, rights or privileges of the said District
under said Contracts, except the right to receive the several
annual payments provided for in said Contracts."

It is further covenanted that the agreement shall be set
up in a supplemental pleading in the suit begun as aforesaid
to determine the rights of the contract holders and that
judgment should be entered fixing their rights as herein set
forth. It is also further provided in the contract that five
per cent of the total amount to be paid to each contract
holder was assigned to their attorney as compensation for
fees for services in connection with the settlement and ad-
justment agreed upon.

The complaint of the plaintiff in this action sets forth all the matters herein referred to, alleges the invalidity of the agreement about to be entered into by the Merced Irrigation District with said contract holders, and seeks an injunction to restrain the defendants from entering into such agreement. In addition to alleging the *ultra vires* nature of said contract, it is alleged that if carried out, it will impose an unequal burden upon the landholders of the district.

On the part of the appellant it is insisted that the proposed agreement, if executed, would prove highly detrimental to the interests of the district and on the part of the respondents it is argued that the results would prove beneficial. With this phase of the question, however, we will express no opinion, as it does not really affect the issues to be determined, there being no allegations of fraud or anything of that character in the complaint which calls in question the results that would be reached by the agreement if executed and carried through to final completion. We have to do only with the question of whether the proposed agreement is or is not *ultra vires*.

Section 2 of the California Irrigation District Act (Stats. 1897, p. 254, as amended by Stats. 1919, p. 717, sec. 2), as it read at the time of the formation of the defendant Merced Irrigation District, provides as follows: "Lands already irrigated and riparian lands may be included in the district if in the judgment of the Board of Supervisors such land will be benefited or if the water used thereon or the rights to the use of water thereon should, in the judgment of the. Board of Supervisors, be taken or acquired for the district." Under this power the 52,379 acres of land irrigated by the water of the Crocker-Huffman Land and Water Company, were taken into the larger district of 185,000 acres now comprising the Merced Irrigation District. Whether it was set forth in the petition for the organization of the defendant irrigation district that it was the purpose of the larger district to acquire the water rights, etc., of the Crocker-Huffman Land and Water system does not appear from the pleadings or transcript in this action but from the fact that the defendant Irrigation District has purchased all the interests of the Crocker-Huffman Land and Water Company subject to the provisions of their contracts with the contract holders hereinbefore referred to, we conclude that such was

the purpose set forth in the petition for the organization of the defendant district and that all the proceedings leading up to the present state of affairs were properly taken and had and that in furtherance of the purposes just set forth, the proposed agreement was negotiated. This brings us to a consideration first of the powers of the board of directors of irrigation districts. These powers, as they apply to the agreement under consideration, are found in section 15 of the irrigation laws of the state (Stats. 1919, p. 661, sec. 1). Omitting the provisions of that section not applicable, it is there specified: "Said board shall also have the right to acquire, by purchase, lease, contract, condemnation, or other legal means, all lands, and waters, and other property necessary for the construction, use, supply, maintenance, repair and improvements of said canal, or canals, and works, whether in this or in other states."

Section 61 of the same act (Stats. 1921, p. 1110, sec. 4), after setting forth certain prohibitions relating to the incurring of indebtedness, reads: "Nothing contained in this section shall be construed as limiting the right of the board to enter into any contract or lease for any lands, waters, water rights or other property as elsewhere in this act authorized and by such lease or contract to bind the district for the payment of the consideration specified in such lease or contract, but if the smallest payment to be made under such lease or contract in any year exceeds an amount equal to ten cents an acre for all the land in the district, such lease or contract shall not be valid unless approved by the commission authorized by law to approve the bonds of irrigation districts as legal investments for savings banks, or unless an assessment sufficient to meet all the payments to become due under such lease or contract shall have been or shall be authorized for that purpose in accordance with section fifty-nine of this act."

This provision of section 59 (Stats. 1919, p. 668, sec. 13), however, so far as material to the circumstances before this court, is not a grant of power additional to that contained in section 15 heretofore set forth, other than that in the purchasing of the property referred to in section 15, the lease or contract may be so drawn as to extend over a period of time, if the conditions therein set forth are complied with. It does not extend the power of the board so far as section

15 relates to purchasing water, water rights and other property necessary for the construction, use, etc., of the canals and works of the district.

[1] The words "water and water rights" used in section 15 have a definite and certain meaning. They relate to the waters to be acquired by the district and distributed by it to the different land owners and water rights, as they relate to the land owners, mean, relate to, and indicate the right of the land owner to have and use upon his lands, as occasion requires, the quantity of water called for in his contract or which may be beneficially used in the irrigation of his lands, and so far as water rights are concerned in relation to the district, it embraces the right of the district to take certain waters and convey them through its systems of canals and irrigating ditches to the various points of use.

[2] The words "other property" appearing in the section, we think, mean other like property necessary for the construction, use, etc., of the works belonging to the district.

[3] The word "necessary" upon which considerable stress has been laid, we think, has a broader meaning than that "which is absolutely indispensable," but includes that which is reasonably convenient, and appropriate for carrying out the purposes expressed in the section following the use of that word. [4] The word "use," as it appears in the section following the granting of power to acquire takes on a special signification; in other words, the waters and water rights and other property authorized to be acquired must be such as is used or may be used in the supply of water to be carried through the canals and irrigating ditches owned by the district. These words relate to the use and the right to the use of the waters to be acquired and not to any compensation to be paid therefor.

[5] With this in view, let us consider again the provisions of the proposed agreement and ascertain what the district proposes to acquire. In the recital portion of the agreement, it is set forth that the district desires to acquire the rights of the said contract holders to receive water at the price provided in said contract. In the granting portion of the agreement on the part of the contract holders, as set forth in paragraph 6 thereof, the contract holders release to the district all and any rights which they have to receive water at the rate specified in said contract and then in para-

graph 9 of the same agreement, the conveyance made by
them is specifically limited so as to include the right to receive
the water at a particular rate and that all their other rights
are retained and ungranted. Does such an instrument
which has to do only with the price paid for the service,
convey the water right which the district is authorized to
purchase, under section 15 of the water law heretofore con-
sidered? The agreement expressly excludes such intention.
It limits the agreement to the matter of compensation or
the money to be paid for the article furnished and not as to
any interest in or right to or easement relating to either
the use or the article itself. What are the water rights
owned by the contract holders? The answer is found in
the exhibits set forth in the transcript. Exhibit "A"
grants a water right to the contract holders as follows: "All
the water, not exceeding at any time 2½ cubic feet per
second, which may be required for irrigating 455 acres of
land." Exhibit "B" conveys a water right as follows:
"All the water, not exceeding at any time 7 81/100 cubic
inches per second, which may be required for irrigating
twenty-five acres of land." Exhibit "E" is as follows:
"All the water, not exceeding at any time 190.1 cubic inches
per second, which may be required for irrigating the lot
described in the district." All the contracts are similar
in their terms, varying only in amounts, and therefore need
not be specifically set forth herein. These contracts estab-
lish the water rights owned by the contract holders and are
the water rights which are expressly retained by them by
the terms and provisions of the agreement proposed to be
executed with them by the district. It will thus be seen that
the district is not acquiring any water rights whatever; it
is simply negotiating with the holders of water rights as to
the compensation that may be fixed for the service. That
such an agreement or proposal does not come within the
terms and provisions of the powers granted by section 15
and that the compensation to be paid for a water right is
not a part of the right itself is more clearly perceived when
we consider the provisions of section 1 of article XIV re-
lating to water rights, which is as follows: "The use of all
water now appropriated or that may hereafter be appropri-
ated for sale, rental, or distribution is hereinbefore declared
to be a public use and subject to the regulation and control

of the state in the manner to be prescribed by law." The manner prescribed by law appears first in the act approved March 12, 1885 (Stats. 1885, p. 95), amended from time to time and now set forth in the act of March 23, 1912 (see Stats. 1911 (Ex. Sess.), pp. 18–64), as supplemented by the act of April 25, 1913 (Stats. 1913, p. 84). These various acts give the power first to the boards of supervisors of the respective counties to change the rate of water furnished for irrigation purposes where water was being furnished for a public use. Water for irrigation is declared to be a public use. The power of fixing rates as existing from that period of time was originally vested in boards of supervisors and is now lodged with the Railroad Commission. The water rights of the respective parties remain the same, cost of service is a separate and distinct matter, being subject to regulation. By reason of the express limitations contained in the agreement, the water rights of the contract holders are exactly the same both before and after. They are all entitled to the specified quantity of water granted them under the terms and provisions of the contracts executed between them and the Crocker-Huffman Land and Water Company. None of these rights are proposed to be or would be acquired by the district in the event of the execution of the agreement now being considered.

By reason of these limiting provisions in the agreement withholding conveyance of water rights of the contract holders and in view of paragraph 8 (assuming it means as alleged by respondents only a remission of the tolls agreed to be paid by the contract holders under their contracts) the proposed agreement stripped of its verbiage amounts to simply this, if the contract holders will pay all assessments levied upon their lands during the life of the agreement, then the district will refund to them the sum of $70,000 per annum, plus eighty-five per cent of whatever amount of expenses the district may incur and levy taxes for in excess of $146,666 per year. We find nothing in the irrigation laws of California which authorizes or permits any such procedure.

[6] Section 15 unquestionably, as we read it, authorizes the acquisition of the water rights owned and possessed by the contract holders herein referred to, if the acquisition of the same be found necessary for the use of the district

in supplying its canals and irrigating ditches with water to be distributed to the various land owners within the exterior boundaries of the district. The necessity for so doing, we think, lies within the jurisdiction of the board of directors and is not a matter to be determined by the courts unless impeached or attacked for fraud or in some manner other than that which simply alleges the lack of wisdom or understanding or incapacity of the board of directors.

Again, section 552 of the Civil Code fixes the water right of the contract holders as an easement to be enjoyed upon the payment of such rates and terms as may be established in pursuance of law. This is the easement which the district does not acquire and which the contract holders expressly retain. Also section 662 of the Civil Code defines such right to be incidental or appurtenant to the land when it is by right used with the land and for its benefit.

[7] The second waiver on the part of the contract holders found in paragraph 6 of the proposed agreement does not furnish any consideration for its execution. It reads: "And hereby agree on their own behalf and on behalf of their successors in ownership of the land to which said Contract is attached not to contest any assessment hereafter levied by said District in accordance with law by reason of dues, rights, privileges or immunity growing out of their rights under said Contract." We do not need to attempt to ascertain what this provision means, but it is manifest that if the assessment is levied "in accordance with law" no contest instituted by the contract holders would be of any avail and an agreement on the part of the district to pay them $70,000 per annum for seventeen years for waiving a right or privilege which they did not possess is an act not authorized by any of the provisions of the laws of the state relating to irrigation districts. However wise it might be to avoid litigation, the board of directors of an irrigation district is not empowered to pay land owners in order to induce them to pay their assessments. It is the duty and the legal duty, which can be enforced against every land owner in the district, to pay all assessments which are levied in accordance with law. [8] It appears from the briefs submitted in this cause that certain statements or promises were made to the contract holders in relation to the acquisition of their water rights by the district in order to induce them to

enter into and become a part of the larger district at the time the proposal and the proceedings to create the larger district were under consideration and being had and taken, but does not furnish or give to the board of directors of the district any additional power than that contained in the statutes. If promises were made not warranted by the law, it would simply be an instance where enthusiasm had usurped knowledge of what might be done under the laws of the state, and in no sense are they reprehensible or furnishing any reason for sustaining an act of the board which would otherwise be considered as *ultra vires*. Such promises furnish no grounds for an estoppel.

By reason of the adjusted compensation or arrangement of payments and credits provided for in the agreement, respondents argued that the contract holders released the property right to the district and that the district thus acquired the right to deal with the property irrespective of the right which was thus released and that the district obtains the release of its property from an easement or burden upon it and as a result of the transaction becomes the actual owner of a greater property than it theretofore owned. The fallacy of this statement is made apparent by the following illustration: Under the terms of Exhibit "E," for example, the Crocker-Huffman Land and Water Company conveys to one E. L. Reed 190.1 cubic inches of the water per second in consideration of a cash payment of $190 and the further payment on the first Monday in September, 1903, of $57.03 and on the first Monday of September thereafter a certain specified sum gradually reduced until the payment is the sum of $19.01. After entering into this agreement, the Crocker-Huffman Land and Water Company conveys its canal system, water, and water rights to the Merced Irrigation District, and after this conveyance the Merced Irrigation District enters into negotiations with E. L. Reed or his assigns changing the terms of the annual payments. The quantity of water, to wit, 190.1 cubic inches, constituting the water right possessed by Reed and his grantors, is expressly eliminated from the agreement. That is to say, both before and after the execution of the proposed agreement, the water right possessed by Reed and his grantors is 190.1 cubic inches. The quantity of water that must be furnished by the district is neither increased nor diminished

by the agreement. The contract holders' rights remain actually the same, from which it follows that the district has acquired no additional property rights whatsoever. The difference in the price of the service does not change the quantity of water included in the contract holder's water right. He is entitled to the 190.1 cubic inches both before and after the execution of the agreement. In other words, the contract holder has sold nothing and the district has bought nothing. From which it follows that the expenditures of money about to be incurred by the district under the arrangement is not authorized by any of the provisions of the law governing irrigation districts empowering them to make purchases.

[9] Section 55 of the California irrigation laws (Stats. 1911, p. 516, sec. 11) authorizes the board of directors of the irrigation districts, instead of levying assessments, to fix rates of toll charges for irrigation or other public uses declared by the act and collect the sum from all persons using the canal for irrigation or other purposes. As this is a legislative grant and a continuing power, we think the provisions of paragraph 8 purporting to waive the right to exact tolls without the power of the board of directors and, therefore, void. This paragraph of the proposed agreement may be read out of the instrument without affecting other portions thereof and although void in itself does not, we think, bear upon the validity or invalidity of the agreement as a whole.

Although elaborately argued, the rights of the contract holders and the district arising out of any assessment that might be levied are not really before us for determination. In some of the states the statutes provide for a hearing whenever an assessment is levied to determine the benefits to the lands assessed, but there is no such provision in our irrigation law. Some of the cases hold that these questions are all presumed to have been taken into consideration and settled at the time the district is formed. Thus in the case of *Fallbrook Irr. Dist.* v. *Bradley*, 164 U. S. 112 [41 L. Ed. 369, 17 Sup. Ct. Rep. 56, see, also, Rose's U. S. Notes], the court says: "The legislature, when it fixes the district itself, is supposed to have made proper inquiry, and to have finally and conclusively determined the fact of benefits to the land

included in the district, and the citizen has no constitutional right to any other or further hearing upon that question.'' To the same effect is the case of *Board of Directors of Modesto Irr. Dist.* v. *Tregea*, 88 Cal. 334 [26 Pac. 237]. See, also, *People* v. *Linda Vista Irr. Dist.*, 128 Cal. 477 [61 Pac. 86], an opinion on rehearing in the case of *Knowles* v. *New Sweden Irr. Dist.*, 16 Idaho, 217 [101 Pac. 87]. The holding in the Knowles case is followed in the case of *Nampa & Meridian Irr. Dist.* v. *Briggs*, 27 Idaho, 84 [147 Pac. 75]. A somewhat different view of this question is taken by some of the courts, as appears in the case of *In re Harper Irr. Dist.*, 108 Or. 598 [216 Pac. 1020], and the cases cited in that opinion. As any opinion we might express on this question would be pure *obiter*, we pass it by without expressing any views thereon as not an issue involved in this case.

[10] It is finally insisted that injunction will not lie in this case by reason of the provisions of the latter portion of section 526 of the Code of Civil Procedure setting forth instances in which an injunction cannot be granted. We find nothing in the section referred to which inhibits the issuance of an injunction herein. We have found that the board of directors are not executing any public statute nor are they, in proposing to enter into the agreement referred to, exercising a public office in a lawful manner. Abbott on Municipal Corporations, section 1134, states the law on this question as follows: ''A court of equity will interfere and restrain by injunction the execution of a contract by a public corporation where the same involves the illegal use of public moneys or property, where it is *ultra vires* or illegal because of irregularities in conditions precedent, or where the effect of the contract would be a waste, misappropriation or misuse of public funds or property.'' The payment of money proposed to be made under the agreement not being in accordance with law, as we construe the irrigation statutes, it follows that the expenditure of the funds of the district in such a manner would amount to a misappropriation or misuse thereof. This we hold will be enjoined upon the application of a property owner and taxpayer within the district.

We think the trial court should have overruled the defendants' demurrer to the plaintiff's complaint. It is, therefore, ordered that the judgment of the trial court herein be and

the same is hereby reversed, with directions to overrule the defendants' demurrer to the plaintiff's complaint and proceed with this cause in accordance with the views expressed herein.

Hart, J., and Finch, P. J., concurred.

A petition by the respondents to have this cause and *Kelsey* v. *Merced Irr. Dist., post,* p. 113 [226 Pac. 853], heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on May 5, 1924, and the following opinion then rendered thereon:

THE COURT.—The petition for transfer of the above-entitled causes to this court after decision in the district court of appeal is denied.

We are satisfied with the conclusion of that court to the effect that the "rights" of the contract holders purporting to be waived, released, or extinguished by the proposed contract are not included within either of the classes of property enumerated in section 15 of the California Irrigation District Act (Stats. 1897, p. 258, as amended by Stats. 1919, p. 661, sec. 1), which the said board is thereby empowered to acquire. We agree with the conclusion that the words "other property" appearing in this section mean other property necessary for the construction, use, supply, maintenance, repair, or improvements of the system or works belonging to the district. We do not understand that such "other property" is limited to other *like* property under the rule of *ejusdem generis.* We withhold our approval from what is said in that opinion respecting the applicability of section 1 of article XIV of the constitution, and sections 552 and 662 of the Civil Code, and the authority of the Railroad Commission to fix rates in such a situation as is discussed herein, and also from the conclusion that the provisions of paragraph 8 of the proposed contract, purporting to waive the right to exact tolls, is a separable covenant which, although void in itself, does not bear upon the validity of the agreement as a whole. The determination of these questions we do not deem necessary to the judgment herein.